[No. 34044.  *En Banc.*  June 27, 1957.]

STOKELY-VAN CAMP, INC., *Respondent*, v. THE STATE OF
WASHINGTON, *Appellant.*[1]

*The Attorney General* and *Robert L. Simpson, Assistant,*
for appellant.

*Howe, Davis, Riese & Jones,* for respondent.

DONWORTH, J.—The question for our decision is whether
respondent is liable for payment of the business and occupa-
tion tax as a manufacturer, as defined in RCW 82.04.110 and
82.04.120.

Respondent paid, under protest, the tax as assessed by the
tax commission of the state of Washington, and sued the
state to recover the amount thereof. At the trial, the parties
filed a stipulation containing the agreed facts. After argu-
ment the trial court made its findings of fact and conclu-
sions of law, upon the basis of which it entered judgment
for respondent in the sum of $20,809.95. The state has ap-
pealed, and by its assignments of error raises only the ques-
tion of law stated above.

The word respondent is used herein to include Stokely-
Van Camp, Inc., and also its predecessor in interest, Pict-

[1]Reported in 312 P. (2d) 816.

sweet Foods, Inc., as though there had been no merger of those corporations.

Prior to March 1, 1954, respondent paid its business and occupation tax, under RCW 82.04.270, as a wholesaler. On that date, the tax commission of the state of Washington (herein called the commission) revised its rule No. 136, by adding to the definition of the term "to manufacture" the following:

"It includes also the preparation and freezing of fresh fruits and vegetables."

Shortly thereafter, the commission levied the business and occupation tax against respondent on the basis that it was a manufacturer within the meaning of the tax statute (RCW 82.04.220 and 82.04.240), and ceased to tax respondent as a wholesaler.

Respondent at all times material to this case has been engaged in the business of preparing fresh fruit and vegetables for packaging and freezing and thereafter packaging and freezing them and selling these products at wholesale.

Respondent's preparation of the fruit and vegetables prior to freezing is described in considerable detail in the stipulation of the facts. The work done with respect to the various items is stated therein as follows:

"1. *Asparagus Cuts*—are sorted, cleaned, butted, cut and blanched.
2. *Asparagus Spears*—are sorted, cleaned and butt-cut to correct length, and blanched.
3. *Broccoli*—is cleaned, cut and trimmed and blanched.
4. *Carrots*—are sorted, cleaned, diced and blanched.
5. *Cauliflower*—is sorted, cleaned, cut, trimmed and blanched.
6. *Corn*—is husked, cut from the cob, blanched and cleaned.
7. *Cob Corn*—is husked, cobs are trimmed, cleaned and blanched.
8. *Composite Products* (mixed vegetables, peas and carrots, succotash)—are mixtures of frozen individual items, processed as herein described, and merely packed and packaged as mixed components.
9. *Green Beans*—are sorted, cleaned, snipped, cut and blanched.

10. *Lima Beans*—are processed the same as peas.
11. *Peas*—after being vined and podded, and sorted and cleaned, are blanched, quality graded and sorted for condition.
12. *Potatoes*—are sorted, cleaned, trimmed and cut, water blanched and oil blanched.
13. *Raspberries*—with the exception of slicing, are processed the same as strawberries, except that sugar is added, in syrup form, to compensate for the variable sugar content of the berries.
14. *Rhubarb*—is sorted, cleaned and cut, blanched, and sugar added to prevent oxidation and preserve texture.
15. *Strawberries*—are sorted and cleaned, sliced and varying amounts of sugar are added (compensating variable sugar content of the berries) to prevent oxidation and to preserve their natural texture."

The important part of the preparation process which is used on all items except rhubarb and berries is known as blanching. This is described in the stipulation as follows:

"Blanching is a very important and essential part of the preparation of fresh vegetables for freezing. It is to be distinguished from cooking. The purpose of blanching is not to cook the vegetables and render them edible, but is to inactivate the enzymes, inhibit off-flavors, retain vitamins, and fix color.

"Blanching, as known to the frozen food industry and to plaintiff's business of preparing fresh vegetables for freezing, consists in heating the vegetables in steam or hot water. Properly conducted, it substantially inactivates enzymes which would otherwise cause the development of off-flavors and losses of color and vitamins C and A during cold storage. Moreover, it fixes the characteristic color of the vegetable.

"Blanching, as distinguished from conventional cooking, should not be carried out for a period long enough to render the vegetable in edible form, and it is not so done by plaintiff. Frozen pre-cooked vegetables, as a rule, do not keep as well in cold storage as do those which have been properly blanched.

"Heat is the best of the known methods of destroying enzymes. The enzymes of peas, which could cause deterioration of the frozen product, are sufficiently inactivated to warrant freezing and safe storage without great loss in qual-

ity when 90% of the respiration activity has been destroyed. Plaintiff reaches this point by blanching for ninety seconds at 205° F.

"It is important, as plaintiff does, to blanch vegetables promptly after harvesting in order to stop objectionable enzyme actions which cause serious losses of sweetness and flavor and other changes which may occur. Moreover, peas and lima beans must be blanched immediately after vining if the effects of the bruising they have received in the vining are to be minimized.

"Blanching also stops the deterioration of the vegetables which occurs after harvesting because of respiration. It, in effect, sterilizes the vegetables and markedly retards the rate of loss of vitamins C and A. The blanching of vegetables not only retards undesirable changes before freezing, but inhibits the development of off-flavors during cold storage and thawing and enhances the general keeping qualities of the food item."

Certain items are packaged before freezing, and others are frozen before packaging. The former are placed in cold chambers, where a wind blast at below zero temperature is blown over the packages for about three hours. Unpackaged items are moved through a tunnel on woven metal mesh for about sixty feet, where a wind blast of similar temperature is blown on them for approximately twenty-five minutes, after which they are dropped on a return belt.

Appellant's first assignment of error is directed to the following conclusion of law entered by the trial court:

"The activities of the plaintiff in preparing and freezing fresh fruits and vegetables does not constitute manufacturing as the term 'to manufacture' is defined in RCW 82.04.120 and that plaintiff is not a 'manufacturer' as defined in RCW 82.04.110 and that the plaintiff is not subject to the tax upon manufacturing in RCW 82.04.240."

In order to decide whether the activities of respondent, which we have described above, subject it to the business and occupation excise tax levied on a manufacturer, it is necessary to examine the pertinent statutory definitions. RCW 82.04.110 defines the term "manufacturer" as follows:

" 'Manufacturer' means every person who, either directly or by contracting with others for the necessary labor or mechanical services, manufactures for sale or for commer-

cial or industrial use from his own materials or ingredients any articles, substances or commodities. When the owner of equipment or facilities furnishes, or sells to the customer prior to manufacture, all or a portion of the materials that become a part or whole of the manufactured article, the tax commission shall prescribe equitable rules for determining tax liability."

The definition of the phrase "to manufacture" is contained in RCW 82.04.120, reading:

" 'To manufacture' embraces all activities of a commercial or industrial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful article of tangible personal property or substance of trade or commerce is produced and shall include the production or fabrication of special made or custom made articles."

The statutory provision levying the tax is found in RCW 82.04.220, and the rate of tax (one fourth of one per cent of the value of the products and by-products manufactured) was fixed in RCW 82.04.240. By amendment in 1953 (chapter 93, Laws of 1953, p. 177), the rate was increased by surtax to three-tenths of one per cent.

The decision of this controversy must be arrived at by an interpretation of the language of the statutes defining "manufacturer" and the phrase "to manufacture" as applied to respondent's activities. Dictionary definitions and judicial decisions from other states are not of much assistance, because, as we said in *North Pacific Coast Freight Bureau v. State,* 12 Wn. (2d) 563, 122 P. (2d) 467, quoting with approval from *Fisher's Blend Station v. State Tax Commission,* 182 Wash. 163, 45 P. (2d) 942:

" 'Statutes providing for the raising of revenue required by the state in carrying on its functions are vital to its welfare, and a person, natural or artificial, should not be declared exempt from the payment of a tax required of business generally, unless it clearly appears that the constitution and laws of the United States (or of the state) require such exemption.' "

Three decisions of this court bearing upon these statutory definitions are cited by appellant: *Drury the Tailor v. Jen-*

*ner,* 12 Wn. (2d) 508, 122 P. (2d) 493; *J. & J. Dunbar & Co. v. State,* 40 Wn. (2d) 763, 245 P. (2d) 1164; *C. V. Wilder Co. v. State,* 48 Wn. (2d) 834, 297 P. (2d) 241.

In the first case mentioned, the taxpayer was a custom tailor who was engaged in fabricating cloth for customers and making it into a suit of clothes upon special orders.

The second case involved the screening out of charcoal particles and other foreign matter from nonpotable whiskey. By this process and the addition of water, an eighty-six proof whiskey was produced, which was then bottled and became salable.

The most recent case involved the making of precast reinforced concrete roof beams for two snowsheds for the state highway department. The beams were made by a subcontractor for the prime contractors who were constructing the snowsheds.

In each of these three cases, this court held that the activities of the respective taxpayers constituted manufacturing within the meaning of the statutes above referred to.

Respondent attempts to distinguish these cases from the case at bar on the ground that in each of the cited cases the materials used were transformed into a different and useful article of commerce, whereas

" . . . the activities of respondent create no usefulness which did not previously exist, but only a preservation of that same degree and form of usefulness through packaging and preservation."

It is argued by respondent that the fruit and vegetables packaged and frozen by it are still the same fruit and vegetables they were when they arrived at its plant.

The ultimate question for decision is whether respondent's activities, hereinbefore described, result in the production of "a new, different or useful article of tangible personal property or substance of trade or commerce."

The process of canning fresh fruit and vegetables is classified by the tax commission in its rule No. 136 (as amended March 1, 1954) as manufacturing as well as preparing and freezing them. The only difference between the two processes is that, as a result of canning, the articles are cooked

and ready for human consumption, whereas in the freezing process they are only blanched and are not edible until the ultimate consumer cooks them. But the object of each process is the same, to wit, to preserve foods for an indefinite period for human consumption.

Respondent, as stated above, stoutly maintains that frozen vegetables are actually the same vegetables that they were when they reached its plant. In other words, they have not been changed by the preparation and freezing process into a new, different, or useful article of trade or commerce. The argument is stated in respondent's brief as follows:

"It is the nature of processing which distinguishes the freezing of foods from the canning of them. This same distinction was recognized by the Tax Commission of the State of Washington until 1954. As will be discerned in cases involving description of the canning process, canning basically produces a cooked, table-ready product, of different characteristics from the constituent raw products. . . ."

From the standpoint of levying an excise tax and considering the legislative definitions quoted above, we are unable to see any distinction between the two processes. It seems to us that each of them produces a "new, different or useful article . . . or substance of trade or commerce." In amending rule No. 136 in 1954, the commission was merely recognizing the public demand for frozen food products and the recent increase in the use of freezing units in stores and homes installed for the sole purpose of preserving such products indefinitely in a condition which kept them available for use by the ultimate consumer. The commission thus applied the statutory provisions to a new process which had come into existence.

Respondent takes the position that its activities are no different from the pasteurization and bottling of milk by a dairy, which the tax commission has classified by rule No. 136 as not constituting manufacturing, because it is merely incidental to nonmanufacturing activities. It seems to us that frozen packed fruits and vegetables are new, different, and useful articles of trade or commerce compared with the articles brought to respondent's plants from the fields, be-

cause they are changed into a form in which they may be kept usable for months or years under proper refrigeration by the retailer and the ultimate consumer. The end result of respondent's activities more nearly resembles the objects attained by the food canning process than it does those connected with the pasteurization of milk.

Respondent further contends that the tax commission exceeded its rule-making authority under RCW 82.32.300, because rule No. 136, as applied to respondent's activities, is inconsistent with and goes far beyond, statutory definitions of the words "manufacturer" and "to manufacture." Respondent cites *Buffelen Lbr. & Mfg. Co. v. State*, 32 Wn. (2d) 40, 200 P. (2d) 509, in support of these contentions. In that case, the taxpayer was taxed as a manufacturer of hogged fuel which was produced as a by-product resulting from its making plywood and doors. The hogged fuel was a waste product which necessarily was made as an incident of the company's principal operations. This court held that the taxpayer was not subject to the manufacturer's tax as to the hogged fuel. Incidentally, the legislature subsequently amended the statute to specifically include by-products as taxable items. The *Buffelen* case is not apposite to our present problem.

There is no doubt that the tax commission, by promulgation of its rules, may not amend or change the enactments of the legislature (*Fisher Flouring Mills Co. v. State*, 35 Wn. (2d) 482, 213 P. (2d) 938), but we are convinced that it has not done so by its amendment of rule No. 136. The statutory definitions of "manufacturer" and "to manufacture" are sufficiently broad to cover the activities described as manufacturing in rule No. 136, as amended March 1, 1954.

Respondent calls our attention to two recent Federal cases: *East Texas Motor Freight Lines v. Frozen Food Express*, 351 U. S. 49, 100 L. Ed. 917, 76 S. Ct. 574, and *Home Transfer & Storage Co. v. United States*, 141 F. Supp. 599 (affirmed without opinion, 352 U. S. 884, 1 L. Ed. (2d) 82, 77 S. Ct. 129).

In the first case, the supreme court (by a vote of five to four) invalidated a ruling of the interstate commerce com-

mission that frozen dressed chickens were manufactured products and hence not exempt under § 203(b)(6) of the act, relating to agricultural commodities.

In the second case, the district court for the western district of Washington (three judges sitting), in a *per curiam* opinion, held, on the authority of the *East Texas* case, that frozen fruits and vegetables were not manufactured products and hence were entitled to exemption as agricultural commodities under § 203(b)(6) of the interstate commerce act. In its decision, the court observed that the precise question presented to it had never been decided by any court.

We have thoroughly examined these decisions, but do not find them persuasive in answering the question to be decided in the present case. The two Federal cases did not involve situations where the court was furnished with a legislative definition of manufactured products. Neither did they involve a revenue act whose purpose was to levy a tax on all businesses and occupations except those specifically exempted. *Crown Zellerbach Corp. v. State*, 45 Wn. (2d) 749, 278 P. (2d) 305. They merely involved a disputed exemption of certain carriers from the regulatory authority of the interstate commerce commission with respect to certain commodities.

We conclude, from our examination of the cases cited and our consideration of the arguments presented by the parties, that the commission correctly interpreted the legislative definitions relating to manufacturing when it included the activities of respondent in respect to freezing fruits and vegetables as being taxable thereunder and levied the excise tax here in controversy. We are further of the opinion that the commission, in amending rule No. 136 in 1954, did not exceed its rule-making authority.

It follows that the judgment of the trial court must be, and is hereby, reversed with directions to dismiss respondent's action.

HILL, C. J., MALLERY, FINLEY, ROSELLINI, OTT, and FOSTER, JJ., concur.

SCHWELLENBACH, J. (dissenting)—In the *Drury* case, cited by the majority, the tailor cut and fabricated cloth from his own stock, in accordance with measurements taken. He manufactured suits.

In the *Dunbar* case, poisonous substances were removed from nonpotable whiskey. Although there could be a difference of opinion as to whether or not the product was still "poison," the process made it salable. The process constituted manufacturing as defined by the statute.

In the *Wilder* case, the prefabricated beams used in the construction of the snowsheds were manufactured.

I fail to see how the process of freezing fresh fruits and vegetables results in the production of "a new, different or useful article of tangible personal property or substance of trade or commerce." It was not so recognized by the tax commission until it revised its rule No. 136 on March 1, 1954. Although the obtaining of additional revenue is very laudable, I do not believe that the tax commission should be permitted to amend a statute enacted by the legislature by changing one of its rules.

WEAVER, J., concurs with SCHWELLENBACH, J.