[No. 36407. En Banc. July 18, 1963.]

McDonnell & McDonnell, *Respondent*, v. The State of Washington, *Appellant*.

Allen V. Smith, Inc., *Respondent*, v. The State of Washington, *Appellant*.

McDonnell Seed Company, Inc., *Respondent*, v. The State of Washington, *Appellant*.*

*The Attorney General, Timothy R. Malone* and *James A. Furber, Assistants*, for appellant.

*Parr & Baker*, for respondents.

Finley, J.—The taxpayers, respondents in these consolidated causes, have challenged the action of the State Tax Commission in imposing a business and occupation tax

*Reported in 383 P. (2d) 905.

respecting manufacturing activity as defined in RCW 82.04-.120, and have petitioned for a refund of taxes paid thereunder.

The State Tax Commission has taken the position that the preparation or processing of dried split peas by the taxpayers comes within the scope of the definition of "manufacturing activity," as set forth in the aforementioned statute. The trial judge sustained the taxpayers' contentions that their activities did not constitute manufacturing within the statutory definition, and rendered judgment voiding imposition of the tax. It should be pointed out that these lawsuits were heard and determined by the trial court prior to the decision in *Bornstein Sea Foods, Inc. v. State* (1962), 60 Wn. (2d) 169, 373 P. (2d) 483.

The taxpayer[1] is engaged in a business involving the acquisition from farmers of raw, dried, field peas in bulk. These are then processed preparatory to disposition by sale on the wholesale market, both within and without the state of Washington. The record establishes that the processing or preparation is as follows:

The peas are removed from their pods prior to being acquired by the taxpayer. After the peas are received by the taxpayer, they are placed and kept in storage for three or four weeks. The peas are thereafter put through a machine called a *clipper cleaner*, whereby the undersized peas, parts of stalks, pods, vines, and any other less useful or foreign materials are removed. The next step in the preparation or processing is to put the peas through a *gravity cleaner*. This machine utilizes air pressure and a shaking motion to remove substandard and defective weevily peas. The weevily peas are infected with a small organism, actually a small beetle of the Rhyncophora group, which, during the three to four week period of storage referred to above, literally eats its way out of the peas. This results in the weevily peas being lighter, and this difference in

---

[1] It was stipulated at the time of trial that the processing of peas was the same for each of the respondents; therefore, in narrating the facts the singular form of taxpayers will be used.

specific gravity makes possible the separation by the *gravity cleaner* of the weevily peas from those uninfected. At the conclusion of these operations, approximately two thirds of the peas are bagged as whole peas and sold on the wholesale market. The tax commission has not attempted to tax these operations, relative to the processing of the whole peas, as a manufacturing activity.

We are concerned with the remaining third of the peas which are destined to become *split* peas. These are subjected to further processing through a screw type conveyor, a part of a machine or apparatus called the *steam auger*. As the peas are carried through a steam chamber, the steam treatment softens the hulls or shells to facilitate their removal and the subsequent splitting of the peas. Thereafter, the peas go through a *splitter*, which consists of a rotary drum with vertical plates. The peas are fed into the top of the *splitter* machine, where, by the exertion of centrifugal force, they are thrown against the side of the drum and split. The trial court found that on occasion it was necessary to rerun the peas through the *splitter* to complete the splitting of all the peas. However, the taxpayer's exhibits (these include samples of peas which have been through the *splitter* once and twice, respectively) and the testimony of a witness for the taxpayer clearly indicate that the peas usually must be processed through the *splitter* at least two or three times to accomplish splitting of all of the peas. The split peas next go through a machine similar to the *clipper cleaner* for the purpose of grading and further removal of undesirable portions. Then, after going through an apparatus or machine for polishing and improving the appearance of the peas, they are packed for shipment.

During the process resulting in splitting of the peas, the hulls and hearts (the latter being a small stem in the pea) are removed. These scrap pieces, combined with the pea chips, constitute a by-product referred to as *offal*. Offal does not result from the processing of whole peas. The removal of the hull in the splitting process results in an

end product, *i.e.*, split peas, which differs in color from the original whole pea with the hull intact.[2]

There are differences in the demand for the respective products—whole peas v. split peas—the demand dependent in part upon the personal preferences of the ultimate consumers. Without such a difference in demand, there would be no practical reason to engage in the operation of splitting peas. In passing, we might observe that the trial judge erred in refusing to permit testimony in regard to the price received by the taxpayer for split peas as contrasted with the price for whole peas. By this we do not mean that a change in value is *the* factor in determining whether a new, different or useful substance has resulted, but it is a factor.

■ The argument, in effect, that "pigs *is* pigs," or that peas are peas, and an identical substance—whether whole as at the inception or split as at the conclusion of the pea-splitting process—and, therefore, the processing should not be considered as manufacturing, was made and rejected in *Bornstein, supra.* There the change was from *fish* to fish *fillet.* In fact, in the *Bornstein* case (page 176) the court, referring to another case in which a manufacturer's tax was imposed, stated that " . . . the taxpayer performed a process on peas . . . and, after the process, he still had peas."

The preparation or processing of the peas and the effect upon them closely approximates the situation with respect to the preparation and processing of bottom fish involved in the *Bornstein* case. We are convinced that the reasoning and the holding in *Bornstein* is applicable and controlling in the instant case.

We realize that the criterion stressed in *Bornstein*—namely, whether there has been a significant change—is somewhat general in nature and may seem easier as a matter of articulation than as a matter of application. Nevertheless, as we stated in *Bornstein*, the end product—that is, the product or substance as it is released or sold by the one performing the process—must be compared with the

---

[2]This conclusion has been derived from an examination of Plaintiffs' exhibits No. 3 and 6.

substance initially received by that processor. In making this comparison, consideration should be given to the following factors: among others, changes in form, quality, properties (such changes may be chemical, physical, and/or functional in nature), enhancement in value, the extent and the kind of processing involved, differences in demand, et cetera, which may be indicative of the existence of a "new, different, or useful substance."

In utilizing the aforementioned factors, it is necessary to bear in mind the admonition in *Bornstein* that "In short, we have come to the position now where we are classifying as 'manufacturing' activities which realistically are not manufacturing in the ordinary sense at all." That is, the definition in RCW 82.04.120 of the term *manufacture* and its tax scope is subject to legislative determination. This determination is not necessarily confined to a classical or orthodox definition of manufacturing, which, in common understanding, usually would connote a spinning, knitting, sewing, sawing, synthesizing, assembly or other fabrication process.

The instant case has been presented to this court as though the only question to be resolved upon this appeal is whether the respondents are engaged in "manufacturing" within the definition set forth in RCW 82.04.120. Both parties have apparently assumed that if the activity constitutes manufacturing then that activity may be taxed under RCW 82.04.240 (tax on manufacturers). However, both parties have apparently overlooked RCW 82.04.440:

". . . That persons *taxable under* RCW 82.04.250 or 82.04.270 *shall not be taxable under* RCW 82.04.230, 82.04-.240 . . ." (Italics ours.)

It has been conceded that the respondents are engaged in wholesaling both within and without the state; therefore, with regard to their wholesaling activity within the state they are *taxable* under RCW 82.04.270. Those activities being taxable under RCW 82.04.270 cannot be taxed under RCW 82.04.240. However, those sales made without the state are not *taxable* under RCW 82.04.270; therefore, the manufacturing of those products may be taxed under RCW

82.04.240. *Crown Zellerbach Corp. v. State* (1954), 45 Wn. (2d) 749, 278 P. (2d) 305.

This cause should be remanded to the trial court for a determination as to what portion of the respondents' manufacturing activity is distributed by wholesaling outside of the state, since only that portion of the respondents' manufacturing activity can be taxed under RCW 82.04.240. The judgment should reflect this determination and should conform to the views otherwise expressed herein. It is so ordered.

OTT, C. J., DONWORTH, ROSELLINI, HUNTER, and HALE, JJ., concur.

WEAVER, J. (dissenting)—I dissent, for I believe the majority opinion extends the doctrine of *Bornstein Sea Foods, Inc. v. State*, 60 Wn. (2d) 169, 373 P. (2d) 483 (1962) to a factual situation that is not within the ambit of RCW 82.04-.120, quoted *infra.*

The majority opinion describes the process in question. The record and exhibits, however, do not give me the impression that the process is as complicated as the opinion suggests.

"Splitting a pea" is a misnomer; nature furnishes it in two parts, and then wraps it. The processing only unwraps it and the parts are thus separated.

Is this "manufacturing" under the taxing statute? I do not think so.

The statute provides:

" 'To manufacture' embraces all activities of a commercial or industrial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful substance or article of tangible personal property is produced for sale or commercial or industrial use, and shall include the production or fabrication of special made or custom made articles." RCW 82.04.120.

The statute lists four requirements:

1. The activities must be of a commercial or industrial nature;

2. Labor or skill must be applied by hand or machinery;

3. A new, different or useful substance or article of tangible personal property must be produced;

4. The article or substance produced must be for sale or commercial or industrial use.

We are concerned only with the third requirement: Is ". . . a new, different or useful substance or article of tangible personal property . . . produced"?

*Bornstein Sea Foods, Inc. v. State, supra,* is the latest pronouncement of this court on the subject. Therein, the court concluded that filleting a fish was "manufacturing" under the statute because

". . . a fillet, once produced, is different from a fish, and hence a new and different article has been created. . . ."

This conclusion was reached by applying the following rule:

". . . We think the test that should be applied to determine whether a new, different, and useful article has been produced is whether *a significant change* has been accomplished when the end product is compared with the article before it was subjected to the process. By the end product we mean the product as it appears at the time it is sold or released by the one performing the process." (Italics mine.)

The majority opinion restates the rule of *Bornstein* but recognizes that it is

". . . somewhat general in nature and may seem easier as a matter of articulation than as a matter of application."

The nucleus of the comparison test is "significant change," which, in the abstract, may mean many things to different men. Is the change from a whole pea to a split pea significant, meaningful, of consequence, or momentous? I do not think so. Implicit in "manufacturing" is the concept that something has been changed to make a new or different product. The trial court found, however, and the record substantially sustains the finding that

" . . . Whether split or whole, there is no change in the pea substance either chemically, by change of color, change of taste, or otherwise. . . ."

Decisions of this court prior to *Bornstein*[3] held the process to be manufacturing if there was a change in substance. I agree that the change must be significant.

*Bornstein* fixes the outer boundary of the definition of "manufacturing" under the statute. It introduces a new element.

" . . . The process of filleting transforms near value-less whole bottom fish into useful and salable consumer items. This change is significant. . . ."

In the instant case, there is no change in substance; there is no significant change in usefulness. The processor started with a substance and at the end of the routine had the same substance—only in smaller pieces. Both the whole and the split pea are used for substantially the same purposes. The pieces of the pea are not a new or different article of tangible personal property within the meaning of the taxing statute; hence the process is not taxable as "manufacturing."

The logic of the majority opinion places the definition of "manufacturing" at the whim of the State Tax Commission.

If this is a "Pigs is Pigs"[4] argument, so be it.

I would affirm the judgment of the trial court.

HILL, and HAMILTON, JJ., concur with WEAVER, J.

---

September 20, 1963. Petition for rehearing denied.

---

[3]*Stokely-Van Camp v. State,* 50 Wn. (2d) 492, 312 P. (2d) 816 (1957); *Crown Zellerbach Corp. v. State,* 53 Wn. (2d) 813, 328 P. (2d) 884 (1958).

[4]Short story by Ellis Parker Butler (1905). *Encyclopedia of Modern American Humor,* Doubleday & Company, Inc. (1954).